UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-CR-80(4) DRL-MGG |
| CARISSA MCCOY, | |
| Defendant. | |

OPINION AND ORDER

Carissa McCoy conspired to distribute 400 grams or more of fentanyl. As a prelude to sentencing, she objects to the presentence investigation report, as revised. She argues for the safety valve, objects to receiving a drug premises enhancement, and says she should receive a minimal participant reduction. The court held an evidentiary hearing and now addresses these objections.

DISCUSSION

A.   *The Statutory Safety Valve and Corresponding Guideline Reduction.*

Through the safety valve, Congress authorized federal courts to sentence below otherwise-applicable mandatory minimum terms. 18 U.S.C. § 3553(f). The guidelines contain a corresponding provision with almost identical language.[1] U.S.S.G. §§ 2D1.1(b)(18), 5C1.2. The safety valve was intended to benefit low-point (often first-time), non-violent drug offenders who weren't leaders or organizers of criminal activity and who made a good faith effort to cooperate truthfully, from the sometimes-harsh minimum sentence mandated by statute. *See* 18 U.S.C. § 3553(f); *United States v. Syms*, 846 F.3d 230, 235 (7th Cir. 2017); *United States v. Ramirez*, 94 F.3d 1095, 1101 (7th Cir. 1996).

---

[1] This guideline has not been formally amended since the 2018 amendments to the statute. Because Ms. McCoy has zero criminal history points, this differential doesn't affect today's decision.

So long as a defendant meets five criteria, "the court shall impose a sentence . . . without regard to any statutory minimum sentence[.]" 18 U.S.C. § 3553(f). The parties only debate part of the second criterion: whether Ms. McCoy "possess[ed] a firearm . . . in connection with the offense." 18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(a)(2). If she did, she's out; if she didn't, she's in. She has the burden to prove she qualifies for the safety valve. *United States v. Ramirez*, 783 F.3d 687, 692-93 (7th Cir. 2015).

Ms. McCoy argues she neither actually possessed nor constructively possessed the firearms found in her home. The government argues constructive possession.[2] "Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when [she] does not actually have immediate, physical control of the object." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). If the defendant "knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others," she constructively possessed the object. *Id.* (citation omitted). This nexus differentiates true possessors from mere bystanders. *See id.*; *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009).

Ms. McCoy's residence here was shared with her husband Brandon Harris, another participant in the fentanyl conspiracy. Brandon Harris joined the conspiracy as a participant before Ms. McCoy did. His involvement included drug distribution and trafficking. Some of his conspiracy activity at their residence pre-dated her involvement.

"When the defendant jointly occupies a residence, proof of constructive possession of contraband in the residence requires . . . a 'substantial connection' between the defendant and the contraband itself, not just the residence." *Id.* at 697; *accord United States v. Castillo*, 406 F.3d 806, 813 (7th Cir. 2005). Constructive possession has existed when a firearm has been found in a defendant's bedroom next to envelopes addressed to him and prescription medications with his name and address;

---

[2] Ms. McCoy contends that conspirator liability should not be considered when deciding the safety valve's application. The government only argues constructive possession, and expressly not conspirator liability. Because the parties draw these battlelines only, the court delves no further.

and when firearms have been found in a bedroom with a gold bracelet with his nickname, bills with his name, and men's clothing. *See Griffin*, 684 F.3d at 697 (respectively discussing *United States v. Richardson*, 208 F.3d 626, 628 (7th Cir. 2000) and *United States v. Kitchen*, 57 F.3d 516, 519-20 (7th Cir. 1995)).

An individual's proximity to the contraband, presence on the property where the contraband is located, or association with the person in actual possession of the contraband, without more, isn't enough to support a finding of constructive possession. *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994) (citation omitted). Rather, "proximity coupled with evidence of some other factor—including connection with [the contraband], proof of motive, a gesture implying control, evasive conduct, [] a statement indicating involvement in an enterprise," *Morris*, 576 F.3d at 668 (quotation omitted), a possessory interest in the location, the firearm's visibility and accessibility, or knowledge of its presence—can suffice, *see United States v. Starks*, 309 F.3d 1017, 1025-26 (7th Cir. 2002).

Here, Ms. McCoy had a substantial connection to the firearms. They were in the kitchen of her home. She lived there. She had control over who visited the home and at times prevented her family's entrance. She left a handwritten letter there. She knew about the three firearms (two loaded) in the kitchen safe. They had been there for two weeks at a minimum, though she admitted as part of the factual basis to her guilty plea that her and her husband agreed to store firearms and drugs for approximately two months. She also admitted at her guilty plea that their shared house was "used to store currency, firearms, and ammunition." An extended magazine and 86 fentanyl pills marked "M/30" were also located in the kitchen safe. She used this type of pill. She had access to the safe with the keys in the bedroom—lying in a visible location in that room where law enforcement also discovered her mail and four fentanyl pills likewise marked "M/30" (aside from her husband's identification card, his birth certificate, another safe and gun box (containing ammunition), $470.00, and marijuana).

3

Ms. McCoy thus had a substantial connection to the firearms based on several features that demonstrate constructive possession. It wasn't her mere relationship with her husband, *see United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir. 1975), the actions of her conspirators, or that she just lived there. Her knowledge of the firearms, her ready access to them, her agreement to store them as her contribution to the conspiracy, and the cohabitating presence of her mail and drugs she used demonstrate she knowingly had the power and intention to exercise dominion and control over the firearms. *See Griffin*, 684 F.3d at 695.

She argues her presence elsewhere at the time of the search ameliorates any power and intention to exercise control over the firearms; however, her momentary physical absence during a drug trafficking trip doesn't sever her connection to the firearms. *See, e.g.*, *United States v. Villasenor*, 664 F.3d 673, 681 (7th Cir. 2011) (defendant constructively possessed a firearm at his Chicago apartment despite being in Texas "to carry out a drug deal" during the search); *Kitchen*, 57 F.3d at 521 (defendant constructively possessed firearms in his residence despite being incarcerated during the search).

Her firearm possession must also be "in connection with the offense"—conspiracy to distribute fentanyl. *See* 18 U.S.C. § 3553(f)(2), U.S.S.G. § 5C1.2(a)(2). This isn't a hard connection to make on this record. Though this circuit hasn't explicitly defined this phrase in the context of 18 U.S.C. § 3553(f) or its companion guideline provision, words are known by the company they keep, and identical phrases in similar contexts typically should be defined the same way. *See United States v. Haynes*, 179 F.3d 1045, 1047 (7th Cir. 1999) (interpreting "in connection with" in separate guideline provisions similarly).

The phrase "in connection with" is interpreted "expansively." *United States v. Sewell*, 780 F.3d 839, 848 (7th Cir. 2015). To meet the "in connection with" requirement, the firearm must serve some purpose with respect to the offense; it must facilitate the offense such that its presence cannot be merely coincidental. *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996). The type, purpose, or

4

location of the firearm; its proximity to the drugs; or use of the residence as a "base of operations for the drug conspiracy" can prove useful in determining if the firearm possession occurred in connection with the offense. *United States v. Fincher*, 929 F.3d 501, 506 (7th Cir. 2019).

Here, three firearms (two loaded) and an extended magazine were stored in a safe alongside a plastic bag containing 86 fentanyl pills marked "M/30"—the very drugs trafficked by the conspiracy. The safe containing these items was stored by two members of the drug conspiracy for its leader. This same drug was being sold out of the residence. A drug ledger, additional firearm magazines and ammunition, and cash were also found in the home. Ms. McCoy thus constructively possessed the firearms to facilitate the conspiracy. Accordingly, the statutory safety valve and the corresponding guideline provision don't apply to Ms. McCoy. The court overrules her objection on this ground.

B. *Drug Premises Enhancement under U.S.S.G. § 2D1.1(b)(12).*

Ms. McCoy objects to the two-level enhancement for maintaining a premises for the purpose of distributing a controlled substance. *See* U.S.S.G. § 2D1.1(b)(12). This enhancement "applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 app. n.17.

A defendant maintains "a drug house if [she] . . . owns or rents premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008). The manufacture, distribution, or storage of drugs need not be the sole purpose of the premises, but it must be one of its primary purposes. *See United States v. Evans*, 826 F.3d 934, 938-39 (7th Cir. 2016). A "premise can have more than one primary use (drug distribution and residence), and, as long as it is more than 'incidental or collateral,' drug distribution does not have to be the 'sole purpose.'" *United States v. Sanchez*, 810 F.3d 494, 497 (7th Cir. 2016) (citations omitted); *accord United*

5

*States v. Contreras*, 874 F.3d 280, 283 (7th Cir. 2017) ("primary" isn't to be mistakenly equated with "most frequent").

In analyzing whether this enhancement applies, the court considers whether the defendant held a possessory interest in the premises, the extent to which she controlled access and activities there, and the frequency of lawful activity there in comparison to storing or distributing drugs. U.S.S.G. § 2D1.1 app. n.17. The court isn't "required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses." *Contreras*, 874 F.3d at 284. Instead, the court focuses on "both the frequency and significance of the illicit activities, including factors such as quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Id.* (citations omitted).

Ms. McCoy lived at this residence. She had control over access and activities there—as she permitted the storage and distribution of fentanyl to occur but also restricted her family's access. The conspiracy's leader and Brandon Harris sold drugs from the home. The conspiracy's leader returned to her residence after trips to procure more fentanyl from his supplier. The residence contained drugs, firearms, and evidence of the trade (cash and a drug ledger). This conduct of her conspirators falls within the scope of joint criminal activity that Ms. McCoy agreed to undertake and thus qualifies as her relevant conduct. *See* U.S.S.G. § 1B1.3(a)(1)(B).

The scope of jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy," so "relevant conduct is not necessarily the same for every participant," U.S.S.G. § 1B1.3 app. n.3(B); but Ms. McCoy agreed jointly to store fentanyl and firearms at her home and permit drug sales to occur from her residence, including to pay off her husband's so-called debt. It would be a stretch to say she embraced all the conspiracy's objectives, but she embraced the objective to have her home used as a hub for the conspiracy, and she engaged in the storage of drugs for the purpose of distribution.

6

Ms. McCoy argues that drug storage and distribution were not primary purposes of the premises. Her conspirators directed customers to the home to buy drugs during an approximate two-month period. A confidential informant discussed her home as a source of distribution. She admitted that her house was used to store currency, firearms, and ammunition. The house—at the time of law enforcement's search—contained a drug ledger, currency, and 90 fentanyl pills (86 pills in the safe and four loose in the bedroom) with the same markings as those they distributed, more than their daily user amounts. In addition, between June 25, 2021 and August 18, 2021, the conspiracy leader made three trips from one of his drug suppliers to Ms. McCoy's home. One of her family members described the leader as always being there. Though she used this home as her residence, drug storage and distribution were two of the home's primary purposes. *See Sanchez*, 810 F.3d at 497. Accordingly, the court applies the enhancement.

  C. *Reduction for Ms. McCoy's Role in the Offense Under U.S.S.G. § 3B1.2.*

Ms. McCoy argues for a minimal participant reduction. The presentence report recommends only a minor participant reduction. The guidelines reduce a defendant's offense level when she plays a lesser role in an offense. If she is a minimal participant, she receives a four-level reduction; whereas if she is a minor participant, she gets a two-level reduction. U.S.S.G. §§ 3B1.2(a), (b). Someone who falls between these categories may receive a three-level reduction. She bears the burden of proving that she is entitled to a role reduction. *United States v. Turnipseed*, 47 F.4th 608, 615 (7th Cir. 2022).

"The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based upon the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2 app. n.3(C). The commentary lists non-exhaustive factors for the court to consider: (1) the degree to which the defendant understood the criminal activity's scope and structure; (2) the degree to which the defendant participated in its planning or organization; (3) the degree to which the defendant exercised decisionmaking authority

7

or influenced the exercise of decisionmaking authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing these acts; and (5) the degree to which the defendant stood to benefit from the criminal activity. *Id.* The court weighs these factors to determine whether the defendant seeking the reduction is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 app. n.3(A).

A defendant is considered a minimal participant—entitled to a four-level reduction—if she is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 app. n.4. Among the least culpable are those who lack knowledge or understanding of the scope and structure of the enterprise and of the activities of others. *Id.* By comparison, a minor role adjustment of two points is appropriate if a defendant is "less culpable than most other participants . . . but whose role could not be described as minimal." U.S.S.G. § 3B1.2 app. n.5.

The court must evaluate the defendant's role "in context of the other participants in the scheme, keeping in mind that a minor [or minimal] player is substantially less culpable than the average participant, not the leaders." *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011) (citation omitted). The mere fact that other conspirators were more involved does not entitle a defendant who was an essential component of the conspiracy to the reduction. *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007). In the context of drug trafficking or conspiracies, a "drug courier should neither automatically receive nor automatically be precluded from receiving a role reduction." *United States v. Saenz*, 623 F.3d 461, 468 (7th Cir. 2010).

Because this determination is heavily dependent on the facts, a description of the totality of the circumstances of this conspiracy is necessary. On this record, this fentanyl conspiracy involved Rico Marion (its leader), Meliki Marion (his spouse and money handler), Cornelius Nelson (drug dealer and money handler), Brandon Harris (drug mule, dealer, and money handler), and Carissa McCoy.

8

Her husband, Brandon Harris (nicknamed "Hometown"), joined the conspiracy before her. He sold fentanyl. He was present with Rico Marion during one of the controlled buys on June 17, 2021. He was caught in New Mexico trafficking fentanyl (1.1 kilograms) from Arizona to Indiana for Rico Marion on June 22, 2021.

Ms. McCoy seemed to enter the conspiracy at least at this point. The drug conspiracy appears to have been ongoing beforehand. For instance, the confidential source who participated in the controlled buys told law enforcement on June 8, 2021 about three addresses associated with Rico Marion, and all three were involved in this conspiracy. One address was Ms. McCoy's shared home with Brandon Harris—rather telltale that some criminal activity had previously occurred there.

On June 22, 2021, after law enforcement temporarily detained Brandon Harris, both Ms. McCoy and Meliki Marion went to a Boost Mobile store to activate a new phone for the continuity of the drug trafficking conspiracy. Ms. McCoy testified as much at her plea hearing. Once Brandon Harris returned the next day, all five conspirators met. During this June 23 meeting, Rico Marion pistol-whipped Brandon Harris for losing the drugs. He made Ms. McCoy and Brandon Harris stay at a specified location to surveil them for any law enforcement cooperation and Rico Marion used the loss to enhance the conspiracy's scale. To pressure their deeper involvement and compliance, Rico Marion demanded the names and addresses of their family members and threatened to kill them.

After a week, Ms. McCoy and her husband returned to their home. They permitted Rico Marion to use their home for the conspiracy, agreed to store drugs and firearms, and allowed for drug distribution at the home [11/10/22 Tr. 28-29; ECF 99 ¶ 18]. A search of the home later would uncover such firearms and drugs. The search also uncovered a drug ledger that Brandon Harris kept to track payment his new debt with Rico Marion for the lost shipment.

Ms. McCoy and her husband agreed to their home's use for drug storage and distribution and firearm storage for approximately two months (late June 2021, when they returned to their home, to

August 19, 2021 when the search occurred). During this approximate two-month period, Rico Marion made three trips from his supply source in Illinois to their residence to transport drugs for storage and subsequent distribution. In July 2021, Ms. McCoy began using fentanyl (and Percocet). She quickly became addicted, using four or five pills a day.

On August 17, 2021, Ms. McCoy flew to Arizona with Rico Marion to transport fentanyl to help pay off her husband's debt. Although she was frightened by the threats that Rico Marion had made against her and her family, she willingly agreed to travel with him to transport a controlled substance. Rico Marion directed this trip and her conduct.

While on this trip, on August 19, 2021, investigators executed a search warrant at Ms. McCoy's home where they discovered the fentanyl pills, firearms, ammunition, drug ledger, cash, and other evidence of the conspiracy. Law enforcement also discovered a handwritten letter authored by Ms. McCoy alleging she was currently being forced to traffic drugs through threats of violence towards herself and her family. Law enforcement notified agents in Texas about her trafficking trip with Rico Marion, and agents intercepted the pair at a bus station on their way home. Ms. McCoy had 1.1 kilograms of fentanyl pills attached to her body to transport back to Indiana. It remains unclear on this record whether she hoped to receive compensation for this trip.[3]

Based on the totality of the circumstances, the court cannot conclude that Ms. McCoy is a minimal participant being "plainly amongst the least culpable of those involved in the conduct of the group." U.S.S.G. § 3B1.2 app. n.4. She is more akin to a minor participant who is "less culpable than most other participants . . . but whose role could not be described as minimal" based on the facts of this conspiracy. U.S.S.G. § 3B1.2 app. n.5. That said, although her role could not be described as

---

[3] Contradicting statements appear in the presentence investigation report about whether Ms. McCoy was to be paid for trafficking drugs outside of paying off Brandon Harris' debt [ECF 99 ¶¶ 16, 22]. On this record, and considering the nature of her involvement, the court cannot conclude by a preponderance of the evidence that she was to be paid for trafficking drugs to Indiana.

10

minimal, the court remains persuaded that a minor classification falls short of capturing her relative culpability given the circumstances in which she agreed to join and then enhance her participation in the conspiracy. She thus qualifies for a three-level reduction.

Ms. McCoy agreed to her home's use as a hub for drug storage and distribution over approximately two months, agreed to store firearms there, and then agreed to transport 1.1 kilograms of fentanyl cross-country—a large segment of the fentanyl attributed to this conspiracy. Large-scale drug trafficking distinguishes her from the other conspirators, and precisely the conspiracy's average participant. *See Leiskunas*, 656 F.3d at 739. Meliki Marion and Cornelius Nelson were never entrusted to transport drugs interstate, let alone over a kilogram of fentanyl. On this record, Meliki Marion collected proceeds from the conspiracy's activity and otherwise handled money and deposits, and Cornelius Nelson engaged in hand-to-hand transactions of smaller quantities.[4] Comparatively, Brandon Harris also transported a similar amount of drugs—approximately one kilogram. On the sliding scale of culpability, Brandon Harris also engaged in hand-to-hand transactions that Ms. McCoy, on this record, did not.[5]

What contextualizes Ms. McCoy's culpability in her favor is largely two-fold. First, she joined later than the other conspirators. On this record, the average participant promoted this conspiracy's criminal activity for a longer period of time. Second, and showing her to be substantially less culpable, her deeper involvement (beyond the procurement of a cellphone) was promoted by violence, threats, and fear, further supported by her handwritten letter. To be sure, she engaged willingly but with added

---

[4] The three conspirators discussed here have yet to be sentenced. Thus, the court makes these conclusions solely based on the evidence presented in Ms. McCoy's case and solely to understand the average participant.

[5] In passing, both Ms. McCoy and the government reference her personal involvement in drug dealing. The court has not been presented with evidence demonstrating this, outside stray references in briefing and unreliable statements from Rico Marion. Rico Marion could not be trusted to tell the truth under oath at sentencing, so the court won't give his statement to law enforcement—worse yet made among shifting stories to law enforcement and not under oath—that she sold drugs any weight. The court cannot find by a preponderance of the evidence that Ms. McCoy ever personally engaged in hand-to-hand drug transactions.

pressure from the fear of grave consequences. None of the others—nor the average participant—joined under such circumstances, and only Brandon Harris (on this record) was additionally threatened at gunpoint to comply further. On this record, other than ready access to a drug of choice, her primary personal benefits were paying off her husband's perceived debt and ensuring her family's safety.

What prevents her from being plainly among the least culpable is the nature and extent of her participation when compared with the average participant in this conspiracy. *See* U.S.S.G. § 3B1.2 app. n.3(C)(iv). Unlike the average participant, Ms. McCoy was entrusted with and engaged in cross-country drug transportation—one of the largest quantities of drugs in this conspiracy, at least on this record. The quantity she trafficked would alone warrant the statutory minimum, so the purpose of U.S.S.G. § 3B1.2 loses some footing.

Ms. McCoy argues that the court shouldn't consider the quantity of drugs she trafficked when evaluating this role reduction; however, the court may consider the quantity as part of the totality of the circumstances. *See, e.g.*, *United States v. Lopez*, 545 F.3d 515, 517 (7th Cir. 2008) (considering the defendant's several deliveries of "large quantities of cocaine"); *Gallardo*, 497 F.3d at 741 (considering the defendant's handling of "large quantities of cash and drugs"). Additionally, Ms. McCoy also agreed to her home's usage as a drug storage and distribution hub where a portion of the conspiracy's distribution was taking place during the period she was involved. Whether she participated or not in drug sales, she certainly knew of it and sanctioned it.

She didn't generally lack knowledge or understanding of the scope and structure of the enterprise, nor of the activities of others. *See* U.S.S.G. § 3B1.2 app. n.4 (defining minimal participant). Notably, the names of the other four participants all appeared on deposit slips for large amounts of currency, so Ms. McCoy may have been less knowledgeable about the handling of drug proceeds. But she knew how Rico Marion procured the conspiracy's drug supply (from both her and her husband's trips), how the conspiracy operated in the sale of drugs (not least from her home), and the identity of

all the players. Indeed, the conspirators all met as a team after Brandon Harris had been caught precisely because they knew what the others were doing, and Rico Marion wanted to ensure that they all fell in line.

Her relative responsibility and discretion in her actions mitigates their gravity. *See* U.S.S.G. § 3B1.2 app. n.3(C)(iv). Her willing consent to her home's use and to traffic fentanyl for the conspiracy was motivated in part through violence, threats, and fear. She had no real discretion as to how to conduct her actions. She was told what to store. She was told to permit drug sales from her home and to store firearms. She was told to assist Rico Marion in drug transportation. She was driven to the airport and told her travel itinerary. When the two arrived in Texas, Rico Marion left to get the drugs. He was in control, and Ms. McCoy was following his lead. She was indeed a mere drug mule this time.

The average participant often took instructions from Rico Marion too. He directed Brandon Harris' trip. He reminded Brandon Harris, when a dispute arose about a debt to Cornelius Nelson, that he should mind his own business because there were part of the same crew—and no doubt one directed in wholesale by Rico Marion. And of course, Brandon Harris became under Rico Marion's thumb to scale his drug dealing from the home. That said, nothing shows that Brandon Harris and Cornelius Nelson only acted at Rico Marion's direction in selling drugs, or Meliki Marion only acted per Rico Marion's instructions in collecting and depositing proceeds, whereas Rico Marion scripted each part of Ms. McCoy's conduct. This factor thus shows her to be less culpable than the average participant, though in fairness if substantial, barely so.

Ms. McCoy didn't plan or organize the criminal activity, nor did she have decisionmaking authority or influence on the exercise of decisionmaking authority. *See* U.S.S.G. §§ 3B1.2 app. n.3(C)(ii)-(iii). She benefitted by helping pay off her husband's debt to Rico Marion and ensuring her and her family's safety. *See* U.S.S.G. § 3B1.2 app. n.3(C)(v). Nor did the average participant though. Only its leader seemed to have this authority and influence, so again her relative culpability compared

to her conspirators was undoubtedly less, but on this record the average participant's decisionmaking authority or influence wasn't so great as to classify hers as comparatively "minimal."

The guideline calls the analysis "heavily dependent" on the facts, and so it is. The analysis can become rather § 3553(a)-like, but the court applies these factors for now to calculate the recommended guideline range correctly. The court sustains her objection in part and finds that she falls between a minimal and minor participant warranting a three-level reduction. *See* U.S.S.G. § 3B1.2. She was not just less culpable than the average participant given all the factors, but of a greater measure than a two-level reduction represents. She was not, however, plainly among the least culpable whose role could be described as "minimal" warranting a four-level reduction.

CONCLUSION

Accordingly, the court OVERRULES Ms. McCoy's objection under the safety valve and to the drug premises enhancement, and SUSTAINS IN PART her objection to the minor role reduction, granting instead a three-level reduction under U.S.S.G. § 3B1.2.

The court DENIES her motion requesting to be sentenced below the statutory minimum, at least under 18 U.S.C. § 3553(f) and U.S.S.G. §§ 2D1.1(b)(18), 5C1.2 [ECF 111, 149], GRANTS her motion to seal [ECF 110], and DENIES her second motion to seal [ECF 148].

The court RESETS her sentencing hearing for April 27, 2023 at 10:00 a.m. at which time the court will address Ms. McCoy's pending motion and all other matters.

SO ORDERED.

February 21, 2023                   *s/ Damon R. Leichty*
                                                    Judge, United States District Court